**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

INTIRA BRADY, individually and on behalf of
all others similarly situated,

                    Plaintiff,

        v.

SPERIAN ENERGY CORPORATION,

                    Defendant.

---

Civil Action No. _____

**Class Action Complaint**

JURY TRIAL DEMANDED

---

## CLASS ACTION COMPLAINT

Plaintiff, Intira Brady, individually and on behalf of all others similarly situated, alleges

as and for her Class Action Complaint against defendant Sperian Energy Corporation, ("Sperian"

or "Defendant"), upon personal knowledge as to herself and her own acts, and as to all other

matters upon information and belief, based upon, *inter alia*, the investigation made by her

attorneys, as follows:

## NATURE OF THE ACTION

1.      This action seeks to redress Defendant's deceptive conduct and bad faith pricing

practices that have caused thousands of Illinois consumers to pay considerably more for their

electricity than they should otherwise have paid.

2.      Traditionally, residential electricity was supplied by regulated utilities like

Commonwealth Edison ("ComEd").  The rates utilities could charge were strictly controlled.  In

the 1990s, however, Enron's unprecedented lobbying campaign resulted in deregulation of state

energy markets in Illinois and elsewhere such that consumers were permitted to choose from a

variety of companies selling residential energy. Seizing on deregulation, Alternative Retail Electric Suppliers ("ARESs") like Defendant Sperian have grown rapidly.

3.      Price is the most important consideration for energy consumers. There is no difference at all in the electricity that Sperian supplies as opposed to the consumer's utility.  The quality of the energy sold does not differ among Sperian and ComEd, and the energy is all transmitted on the same transmission lines.  As such, the only reason a consumer switches to an ARES like Sperian is for the prices offered in a competitive market as opposed to prices offered by a regulated utility.  That is, after all, the entire point of energy deregulation.

4.      Sperian has exploited the deregulation of the retail electricity market in Illinois by luring consumers into switching energy suppliers using a bait-and-switch scheme designed to deceive reasonable consumers.  Sperian lures its customers into switching electricity suppliers by offering teaser rates that are fixed for a limited period of time and initially lower than the local utilities' rates for electricity.  Once the initial teaser rate expires, Sperian switches its customers over to its market variable rate, which is invariably higher than the initial teaser rate.  Sperian's market variable rate is likewise substantially higher than the competing local utilities' and other ARES' rates and is disconnected from true market-based rates.

5.      Specifically, when the market price goes down, Sperian's rate remains at an inflated level significantly higher than the market rate.

6.      This unfair and deceptive scheme of charging inflated electric prices, while failing to pass-along decreases, is intentionally designed to maximize revenue for Sperian.

7.      As a result of Sperian's deceptive, improper, and bad faith pricing practices, Illinois consumers are being fleeced millions of dollars in exorbitant charges for electricity after they switch to Sperian as their energy supplier.

8.  This suit is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS § 505/1 et seq. and the common law of Illinois on behalf of a class of Sperian customers in the State of Illinois who were charged a variable rate for electricity at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment.  Through its deceptive, unconscionable, and bad faith pricing practices, upon information and belief, Sperian bilked the class, tens of thousands of current and former customers with variable-rate electricity plans, out of millions of dollars.  Accordingly, this lawsuit seeks, *inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

9.  Intira Brady is a natural person and citizen of Illinois. Plaintiff Brady was a customer of Sperian Energy beginning in April 2012, and as a result of Defendant's deceptive conduct, improper and bad faith pricing practices, she incurred excessive charges for electricity.

10.  Defendant, Sperian is a corporation with its principal office located at 3010 Briarpark Dr. Ste. 200, Houston, TX 77042 with its registered office located at 211 E. 7th St., Ste. 620, Austin, TX 78701.

## JURISDICTION AND VENUE

11.  This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class are citizens of States different from Defendant.

12.  This Court has general personal jurisdiction over Defendant.  Defendant does business in Illinois through continuous, permanent, and substantial activity in Illinois.

13.     This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of electricity to Illinois consumers.

14.     Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391.  Defendant regularly transacts and solicits business in this District, and Plaintiff resides in this District.

## SUBSTANTIVE ALLEGATIONS

15.     Deregulation began around the mid to late 1990s.  In December 1996, when Connecticut was considering deregulation, Enron CEO Jeffrey Skilling insisted that "[e]very day we delay [deregulation], we're costing consumers a lot of money . . . .  It can be done quickly. The key is to get the legislation done fast."[1]

16.     Shortly thereafter, in 1997, Illinois deregulated the market for retail electricity supply, a major break with past policy.

17.     Prior to deregulation, electricity was supplied and distributed solely by local utility companies.  Over the last several years, a number of states, including Illinois, have begun to change the regulations in the energy industry purportedly to enhance competition between energy providers.  The purpose of deregulation is to enhance competition between energy providers in the hopes that Alternative Retail Electric Suppliers ("ARESs") such as Defendant would help to lower energy costs.

18.     Today, 98 ARESs sell electricity in Illinois.  According to the Illinois Commerce Commission, from June 1, 2016–May 31, 2017, ARES customers in the ComEd territory paid more than $198 million more for electricity than traditional utility customers in this territory.

---

[1] Christopher Keating, "Eight Years Later . . . 'Deregulation Failed,'" Hartford Courant, Jan. 21, 2007.

19.     In the past three years, residential and small-commercial ARES customers statewide have paid almost $400 million more for electricity than traditional utility customers.[2]

20.     And Illinoisans are not alone in having suffered severe financial harm.  Of the 42 states that started the deregulation process or considered it, only 17 and the District of Columbia remain deregulated or partially deregulated.

21.     A Connecticut leader who participated in that state's foray into energy deregulation summarized the negative consequences of deregulation, "Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex . . . .  If somebody says, no, we didn't screw up, then I don't know what world we are living in.  We did."[3]

22.     As part of Illinois' deregulation plan, ARESs such as Sperian are subject to minimal regulation and do not have to seek approval of its rates, nor the method by which it set its rates, with the Illinois Commerce Commission ("ICC").

23.     ARESs play a middleman role: they purchase energy directly or indirectly from companies that produce energy and sell that energy to end-user consumers.  However, ARESs do not deliver energy to consumers.  Rather, the companies that produce energy deliver it to consumers' utilities, which in turn deliver it to the consumer.  ARESs merely buy electricity at the wholesale rate and then sell that energy to end-users with a mark-up.  Thus, ARESs are essentially brokers and traders: they neither make nor deliver electricity, but merely buy electricity from a producer and resell it to consumers.

24.     If a customer switches to an ARES, the customer will have his or her energy "supplied" by the ARES, but still "delivered" by their existing utility.  The customer's existing

---

[2] Illinois Attorney General Lisa Madigan is pursuing legislation to require stronger oversight of ARESs.  *See* http://www.illinoisattorneygeneral.gov/pressroom/2018_04/20180409.html.

utility continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

25.     After a customer switches to an ARES, the customer's energy supply charge—based on a customer's kilowatt hour usage—is calculated using the supply rate charged by the ARES and not the regulated rate charged by customer's former utility. The supply rate charged is itemized on the customer's bill as the number of kilowatt hours ("kWh") multiplied by the rate. For example, if a customer uses 300 kWh at a rate of 11.0¢ per kWh, the customer will be billed $33.00 (300 x $.11) for her energy supply.

26.     Sperian takes advantage of the deregulation and the lack of regulatory oversight in the energy market by deceptively charging Illinois consumers exorbitant rates for electricity. Sperian lures consumers to switch from their local utility companies or other energy suppliers, promising, upon information and belief, that it will offer market based variable rates for electricity. However, in reality, after switching to Sperian Energy as a supplier, consumers' energy bills increase dramatically.

27.     The end result is that, instead of benefitting from switching to Sperian, a typical customer loses out – to the tune of hundreds or even thousands of dollars per year. Thus, Sperian deceptively causes its customers to pay considerably more for electricity services than they should have and otherwise would have paid.

**Sperian Energy Charges Deceptively High Electricity Rates**

28.     Sperian engages in a classic bait-and-switch deception scheme. Sperian lures consumers into switching to its electricity supply service by offering teaser rates that are much lower than its regular rates.

---

[3] Christopher Keating, Eight Years Later . . . "Deregulation Failed" HARTFORD COURANT,

29.     Plaintiff's experience was typical.   In or around April, 2012, a Sperian representative solicited Ms. Brady at her residence to switch from her utility company, Commonwealth Edison, to Sperian with promises of a more competitive rate if she switched to Sperian.

30.     In or around April 2012, Plaintiff made the switch to Sperian for electricity.

31.     Plaintiff was initially placed on an introductory fixed rate plan for electricity for 12 months.

32.     After the fixed rate expired, Plaintiff was switched to a variable rate plan.  Upon information and belief, Sperian represented in its uniform contract to Plaintiff and class members that its variable rate would be based on market conditions and Sperian's cost for electricity.  As such, Sperian's contract makes an express link between the variable rate charged by the company and the underlying wholesale market rate, stating the variable rate will be "based on changing market conditions."

33.     A reasonable consumer, like Plaintiff Brady, would understand that Sperian's variable rates change in a manner correlated with the underlying wholesale market rate, and that, although prices would go up when wholesale prices rose, they would also go down when wholesale prices decreased, enabling consumers to take advantage of market lows.

34.     Instead, and contrary to reasonable consumer expectation, Sperian used its variable rates as a pure profit center, increasing the rates charged to Plaintiff and class members when wholesale prices rose, but staying at a level significantly higher than the wholesale market rates when the wholesale prices fell.

---

Jan. 21, 2007, n. 5.

35.    Any reasonable consumer would understand based on these representations that Sperian's variable rate would reflect Sperian's cost for purchasing electricity at wholesale, and that the variable rate would be competitive with the rate offered by the local utility and other ARESs.  Yet, the rates Sperian charged Plaintiff were not commensurate with rates otherwise available in the market or with changes in wholesale rates but were instead inflated rates based on Defendant's price gouging.

36.    The following chart identifies a representative sampling of billing periods[4] during the time Plaintiff was on Sperian's variable rate plan.  It lists the prices that Plaintiff paid Sperian during her variable-rate period and compares these prices to ComEd's and the wholesale market[5] prices during this same time.  The chart demonstrates that Sperian did not price its kWh based on market conditions:

| Billing Period End Date[6] | Sperian Rate ($/kWh) | ComEd Rate[7] ($/kWh) | Wholesale Rate ($/kWh)[8] |
|---|---|---|---|
| 8/26/2016 | $ 0.07590 | $ 0.06190 | $ 0.05 |
| 9/27/2016 | $ 0.07390 | $ 0.06200 | $ 0.05 |
| 10/27/2016 | $ 0.07390 | $ 0.06388 | $ 0.05 |
| 11/28/2016 | $ 0.07690 | $ 0.06388 | $ 0.04 |
| 12/30/2016 | $ 0.07690 | $ 0.06388 | $ 0.05 |
| 1/31/2017 | $ 0.08590 | $ 0.06318 | $ 0.07 |
| 3/2/2017 | $ 0.08590 | $ 0.06318 | $ 0.04 |

---

[4] The billing periods listed in the chart have been identified through the bills that are in Plaintiff's possession.  The full billing summary of the time Plaintiff was on Sperian's variable rate plan and the variable rates Plaintiff was charged will be ascertained through discovery.

[5] Upon information and belief, Sperian acquires its customers' energy on the wholesale market in Plaintiff's territory at the PJM Interconnection wholesale rate. PJM Interconnection is a regional transmission organization that coordinates the movement of wholesale electricity in all or parts of several states, including Illinois.

[6] The first day of the period is approximately thirty days before.

[7] The ComEd utility Price to Compare was found at: https://www.pluginillinois.org/FixedRateBreakdownComEd.aspx. (last accessed October 16, 2018).

[8] The PJM Wholesale Market Price is comprised of weighted locational-marginal pricing, which includes electric-generation service and transmission charges.

| | | | | | |
|---|---|---|---|---|---|
| 3/29/2017 | $ | 0.08590 | $ | 0.06318 | $ | 0.05 |
| 4/27/2017 | $ | 0.08590 | $ | 0.06318 | $ | 0.04 |
| 5/30/2017 | $ | 0.07640 | $ | 0.06318 | $ | 0.05 |
| 6/29/2017 | $ | 0.08990 | $ | 0.06892 | $ | 0.05 |
| 7/26/2017 | $ | 0.08990 | $ | 0.06892 | $ | 0.05 |
| 8/24/2017 | $ | 0.08990 | $ | 0.06892 | $ | 0.05 |
| 9/22/2017 | $ | 0.08290 | $ | 0.06892 | $ | 0.05 |
| 10/23/2017 | $ | 0.09990 | $ | 0.07149 | $ | 0.05 |
| 2/26/2018 | $ | 0.11790 | $ | 0.07195 | $ | 0.04 |
| 3/27/2018 | $ | 0.11790 | $ | 0.07195 | $ | 0.04 |
| 4/25/2018 | $ | 0.12399 | $ | 0.07195 | $ | 0.04 |
| 5/24/2018 | $ | 0.12606 | $ | 0.07195 | $ | 0.04 |
| 6/25/2018 | $ | 0.12699 | $ | 0.07358 | $ | 0.05 |

37.     In the electricity market, the rates Illinois utilities, like ComEd, charge is generally an accurate reflection of market-based rates because ComEd purchases electricity for its customers via a competitive procurement process from the same wholesale electricity market as Sperian.

38.     Utilities (and ARESs) purchase electricity at the wholesale level for resale to their customers.  Thus, the purchases made by the utilities from the wholesale market reflect actual market costs and conditions.

39.     Thus, there is little question that ComEd's price of electricity is an accurate reflection of the wholesale market conditions, as ComEd energy is purchased at the market in a variety of contractual forms, with a mix of hourly, short-term fixed, medium-term fixed and long-term fixed contracts.

40.     Indeed, because of the enormous size of the ComEd and Ameren purchases, ComEd's purchases essentially set the price for energy at wholesale for *all* purchasers.  As PJM explains, "PJM markets are designed to promote competitive outcomes derived from the interaction of supply and demand in each of the PJM markets.  Market design itself is the primary

means of achieving and promoting competitive outcomes in PJM markets." "2018 Quarterly State of the Market Report for PJM: January through March" at 96. The extent of ComEd's and Ameren's demand thus has a dramatic effect on supply and therefore pricing through the PJM.

41.     ComEd and Ameren do not purchase electricity themselves. Rather, the Illinois Power Agency Act established the Illinois Power Agency ("IPA") which is required to purchase the electricity that ComEd sells to its customers.

42.     The IPA on an annual basis prepares a power purchase plan that uses a mix of purchasing strategies with the goal of "ensur[ing] adequate, reliable, affordable, efficient and environmentally sustainable electric service at the lowest total cost over time…." 2017 IPA Annual Report at 1.

43.     Similarly, EGSs such as Sperian have various options to buy electricity at wholesale for resale to retail customers, including: owning electricity production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing electricity in advance by purchasing futures contracts for the delivery of electricity in the future at a predetermined price. The purpose of deregulation is to allow EGSs to use these and other innovative purchasing strategies to reduce electricity costs.

44.     That Sperian's rate was consistently substantially higher than the local utility's rate therefore demonstrates that Sperian's rate is not in fact based on market conditions and Sperian's cost for electricity (i.e. the wholesale cost of electricity). While the ComEd rates may not be a perfect reflection of wholesale market rates (utilities have true-ups and other adjustments in their rates) one would expect Sperian's rates to more or less hover around the ComEd rate

such that in a relatively equal number of months Sperian's rates would be slightly lower, or higher, than ComEd's rates.

45.     But for all of the months Ms. Brady was on Sperian's variable rate, the variable rate was substantially higher than the ComEd rate. As evidenced by the above chart, there were multiple months where Plaintiff's electricity rate with Sperian was ***over 60% higher*** than ComEd's rate during that same billing period.

46.     Moreover, that Sperian's variable rate is not in fact a rate that is based on changes in market conditions is demonstrated by the fact that Defendant's rate was always significantly higher than the wholesale rate.

47.     That Sperian's rates do not reflect market costs and Sperian's costs for wholesale electricity is also demonstrated by the disconnect between changes in wholesale electricity prices and Sperian's costs. While the wholesale rate might show more short-term fluctuations than Sperian's costs, overtime, the wholesale rate is an accurate reflection of wholesale market costs.

48.     The cost of wholesale electricity is the primary component of the non-overhead costs Sperian incurs. Thus, no other factors can explain Sperian's inflated variable rate or the reason its rates are so disconnected from wholesale market costs and conditions because Defendant's cost of supplying the consumer with energy is overwhelmingly the wholesale cost of that energy.

49.     That Sperian's variable rate does not reflect market costs for wholesale electricity is also demonstrated by the disconnect between fluctuations in wholesale electricity prices and costs and Sperian's rates. As the wholesale market price fluctuates, Sperian's variable rate does not correspond to those fluctuations. Instead, Sperian's variable rate remains significantly higher than the corresponding market price. As evidenced by the above chart, there were multiple

months where Plaintiff's electricity rate with Sperian was *over 100% higher* than the market rate during that same billing period. Put simply, when market conditions changed, Sperian's rate did not.

50. The truth is Sperian does not price its electricity based on changing market conditions and Sperian's cost for electricity.

51. Sperian's statements with respect to the electricity rates it means to charge are materially misleading because consumers do not receive a market-based price. Instead, consumers are charged rates that are substantially higher. Sperian fails to disclose this material fact to its customers.

52. Sperian uses its variable rates as a profit center, increasing the rates it charged to Plaintiff and class members and staying at a level significantly higher than the local utilities' rates and the wholesale market rate.

53. As set forth above, Sperian breaches its customer contract as its consumers do not receive a price based on market conditions and Sperian's cost for electricity. Instead, consumers are charged rates that are substantially higher than those of competitors and untethered from market conditions. Sperian intentionally fails to disclose this material fact to its customers because no reasonable consumer—including Ms. Brady—who knows the truth about Sperian's exorbitant rates would choose Sperian as an electricity supplier.

54. Defendant Sperian's statements and omissions regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price. No reasonable consumer who knows the truth about Sperian's exorbitant rates would choose Sperian as an electricity supplier.

55.     Sperian intentionally makes these misleading statements regarding its electric rates so that reasonable consumers like Plaintiff would rely upon its statements and switch their electricity supplier to Sperian.

56.     In fact, all that Sperian offers customers is electricity delivered by local utilities, commodities that have the exact same qualities as electricity supplied by other ARESs or local utilities.  There is nothing to differentiate Sperian Energy from other ARESs or local utilities, and the potential for a competitive market-based price is the only reason any reasonable consumer would choose Sperian as her electricity supplier.

57.     Sperian knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes with regard to the rate being market based were made for the sole purpose of inducing consumers to sign up for Sperian's electricity supply so that it can reap outrageous profits to the direct detriment of Illinois consumers without regard to the consequences high utility bills cause such consumers.  As such, Sperian's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

58.     Sperian's misstatements and omissions caused injury to Plaintiff because she believed that her rate would be based on market conditions and Sperian's cost for electricity when switching from Commonwealth Edison to Sperian's electricity plan.  Plaintiff would not have enrolled in Sperian's plan but for its false misrepresentations.  Had Plaintiff known that the rates she would be charged by Sperian would be substantially higher than her local utility provider (and not based on market conditions), she would not have made the decision to switch.

59.     Had Sperian Energy charged Plaintiff a rate that was actually based on market conditions and Sperian's cost for electricity, Plaintiff would have been charged a substantially lower rate, and she was injured accordingly when she paid her bills.

-13-

60.     Defendant's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.* and the common law are applicable to all members of the Class, and Plaintiff is entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## CLASS ALLEGATIONS

61.     Plaintiff brings this action pursuant to Illinois law on behalf of herself and all other similarly situated Sperian customers in the State of Illinois who were charged a variable rate for electricity at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment.

62.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or complaint.

63.     Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which any Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

64.     This action is properly maintainable as a class action.  The proposed Class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable. There are questions of law or fact common to all Class Members that predominate over any questions affecting only individual members.  Specifically, the common questions of fact and law include:

> i.  whether Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

    ii.   whether Defendant breached its contract with Illinois consumers by charging variable rates not based on changing market conditions;

   iii.   whether Defendant is being unjustly enriched by deceptively charging rates substantially over those available in the market;

   iv.   whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

    v.   whether Defendant should be enjoined from continuing to charge variable rates not based on market conditions.

65.    The proposed lead Plaintiff's claims are typical of those of the proposed class because the proposed lead Plaintiff's claims are based upon the same facts and circumstances (practice or course of conduct) that gives rise to the claims of the other class members and based upon the same predominate legal theories.

66.    The representative Plaintiff can adequately and fairly represent the class. No conflict of interest exists between the representative Plaintiff and the Class Members because Defendant's alleged conduct affected them similarly.

67.    The Plaintiff and her chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the Plaintiff's attorneys are competent in the areas of law relevant to this Complaint and have sufficient experience and resources to vigorously represent the Class Members and prosecute this action.

68.    A class action is superior to any other available method for adjudicating this controversy. The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the Class, (ii) to keep the courts from being inundated by hundreds or thousands of repetitive cases, and (iii) to reduce transactions costs so that the injured class members can obtain the most compensation possible. Accordingly, class

treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation relevant to this action.

## CLAIMS FOR RELIEF

### COUNT I
**(Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.*)**

69.     Plaintiff incorporates by reference the preceding allegations as if fully set forth herein, and further alleges:

70.     815 ILCS § 505/2 declares unlawful "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce[.]"

71.     Upon information and belief, Sperian knowingly and willfully misrepresented to Plaintiff and the Class that its rates are based on market conditions and Sperian's cost for electricity when its rates are not, in fact, based on market conditions and Sperian's cost for electricity.

72.     Sperian knowingly and willfully failed to inform consumers of the material fact that its rates are substantially higher than those otherwise available in the market, and intends that consumers rely upon the deception.

73.     Sperian's deception caused Plaintiff and the class to pay substantially higher rates than those otherwise available in the market.

74.     Sperian made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

75.     Plaintiff and the other members of the Class entered into agreements to purchase electricity from Sperian for personal use and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of Illinois Consumer Fraud and Deceptive Business Practices Act.

76.     As a consequence of Defendant's wrongful actions, Plaintiff and the other members of the Class suffered an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Sperian charged a rate for electricity based on market conditions and Sperian's cost for electricity or had they not switched to Sperian from their previous supplier.

77.     Plaintiff and other members of the Class suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Sperian if the true facts concerning its rates had been known.

78.     Through the conduct described above, Sperian has engaged in deceptive acts and practices that resulted in injury to Plaintiff and the other members of the Class.

79.     By reason of the foregoing, Sperian has violated ICFA and should be enjoined from continuing to fail to disclose that its rates are substantially higher than those otherwise available in the market and, upon information and belief, misrepresenting that its rates are based on market conditions and Sperian's cost for electricity.

80.     Sperian is also liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees and costs.

81.     Sperian's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiff and the other members of the Class.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## COUNT II
### (Breach of Contract)

82.     Plaintiff incorporates by reference the preceding allegations as if fully set forth herein, and further alleges:

83.     Plaintiff and the Class entered into a valid contract with Sperian for the provision of electricity.

84.     Upon information and belief, pursuant to the Agreement, Sperian agreed to charge a variable rate for electricity based on market conditions and Sperian's cost for electricity.

85.     Pursuant to the Agreement, Plaintiff and the Class paid the variable rates charged by Sperian for electricity.

86.     However, Sperian failed to perform its obligations under the Agreement because it charged variable rates for electricity that were not based on market conditions and Sperian's cost for electricity.

87.     Sperian had actual knowledge of its breach through other actions brought against it, including by the Illinois Attorney General and in Pennsylvania litigation.

88. Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was substantially higher than they would have been had Sperian based its variable rate on market conditions and Sperian's cost for electricity.

89. By reason of the foregoing, Sperian is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT III
### (Unjust Enrichment)
### (In the Alternative to Count II)

90. Plaintiff incorporates by reference the preceding allegations as if fully set forth herein, and further alleges:

91. If the Court finds no contract existed between Plaintiff and Defendant, Plaintiff brings this claim for unjust enrichment.

92. By engaging in the conduct described above, Sperian has unjustly enriched itself and received a benefit beyond what was contemplated in the contract, at the expense of Plaintiff and the other members of the Class.

93. It would be unjust and inequitable for Defendant to retain the payments Plaintiff and the Class made for excessive electricity charges.

94. By reason of the foregoing, Sperian is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of which shall be determined at trial, plus attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)     Issue an order certifying the Class defined above, appointing the Plaintiff as Class representative, and designating her Attorneys as Class Counsel;

(b)     Find that Sperian has committed the violations of law alleged herein;

(c)     Enter an order granting monetary relief and damages on behalf of the Class;

(d)     Determine that Sperian has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Class;

(e)     Determine that Sperian breached the contract with the Class and enter an appropriate order awarding monetary and injunctive relief;

(f)     Enter an order granting all appropriate relief on behalf of the Class under the applicable state laws;

(g)     Render an award of compensatory damages, the amount of which is to be determined at trial;

(h)     Render an award of punitive damages;

(i)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(j)     Grant all such other relief as the Court deems appropriate.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial on all issues so triable.

Date: October 17, 2018                    Respectfully submitted,


                                          INTIRA BRADY
                                          Class Plaintiff,


                                           _/s/ Richard J. Burke_____
                                          Richard J. Burke
                                          Jamie E. Weiss
                                          Zachary A. Jacobs
                                          **QUANTUM LEGAL LLC**
                                          513 Central Avenue
                                          Suite 300
                                          Highland Park, IL 60035
                                          Tel: (847) 433-4500
                                          rich@qulegal.com
                                          jamie@qulegal.com
                                          zachary@qulegal.com


                                          Jonathan Shub
                                          Kevin Laukaitis
                                          **KOHN SWIFT & GRAF, P.C.**
                                          1600 Market Street
                                          Suite 2500
                                          Philadelphia, Pennsylvania 19103
                                          (215) 238-1700
                                          jshub@kohnswift.com
                                          klaukaitis@kohnswift.com


                                          Charles E. Schaffer
                                          Daniel C. Levin
                                          **LEVIN SEDRAN & BERMAN LLP**
                                          510 Walnut Street, Suite 500
                                          Philadelphia, PA 19106
                                          Phone: 215-592-1500
                                          CSchaffer@lfsblaw.com
                                          DLevin@lfsblaw.com


                                          **Attorneys for Plaintiff and
                                          the Class**