**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| INTIRA BRADY and ROBERT LUKASZYK, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>   v.<br><br>SPERIAN ENERGY CORPORATION,<br><br>            Defendant. | Civil Action No. 1:18-cv-06968<br><br>**Amended Class Action Complaint**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Intira Brady and Robert Lukaszyk, individually and on behalf of all others similarly situated, allege as and for their First Amended Class Action Complaint against Defendant Sperian Energy Corporation, ("Sperian" or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation made by their attorneys, as follows:

## NATURE OF THE ACTION

1.     This action seeks to redress Defendant's deceptive, unfair and inequitable conduct that has caused thousands of Illinois consumers to pay considerably more for their electricity than they should otherwise have paid.

2.     Traditionally, residential electricity was supplied by regulated utilities like Commonwealth Edison ("ComEd"). In the 1990s, however, Enron's unprecedented lobbying campaign resulted in deregulation of state energy markets in Illinois and elsewhere such that consumers were permitted to choose from a variety of companies selling residential energy.

Seizing on deregulation, various states, including Illinois permitted the creation of Alternative Retail Electric Suppliers ("ARESs"), like Sperian, to provide electricity to customers largely outside of the regulatory regime of the Illinois Commerce Commission.

3.     Because electricity is a commodity, price is the predominant consideration in the purchase of electricity. There is no difference in the electricity that Sperian supplies as opposed to the consumer's utility. Electricity is a commodity which is transmitted through the Grid on the same transmission lines. Even Sperian acknowledges this truth as it states in its "Welcome" letter that "[a]s a Sperian Energy customer, the only difference you will see on your electric bill is in the supplier portion on the bill …. [where] you will see Sperian Energy's name …". *See* Welcome Letter, a true and correct copy of an exemplar Welcome Letter is attached as **Exhibit A**. As such, the only reason a consumer switches to an ARES like Sperian is for the price offered in a competitive market as opposed to prices offered by a regulated utility. That is, after all, the entire point of energy deregulation.

4.     Sperian has exploited the deregulation of the retail electricity market in Illinois by deceptively inducing consumers into switching energy suppliers through false and misleading promises of savings and discounts and a lower, more "competitive rate" than ComEd's rate.

5.     Sperian utilizes sales representatives who endeavor to solicit ComEd customers to switch to Sperian's electricity plans. Upon information and belief, as stated in detail below, the Sperian sales representatives were given approved sales scripts by Sperian providing uniform misleading representations in the solicitation of new Sperian customers.

6.     In spite of promises to the contrary, Sperian knows its rates will be higher than ComEd's rates because historically they have been higher, and are unlikely to ever be lower, than the rates charged by ComEd, because historically they have not. This unfair and deceptive bait

and switch scheme of charging inflated electricity prices is intentionally designed to maximize revenue for Sperian at the expense of its customers.

7.    Once the customer agrees to switch to Sperian upon the false and misleading promise of "lower rates", Sperian notifies ComEd, referred to as the Electric Distribution Company (or "EDC"), to continue billing the customer, but to charge the customer Sperian's per kWh rate (known as the "generation supply charge") rather than ComEd's generation supply charge. ComEd delivers the electricity to the customer, performs all billing and collection, as well as, meter reading and line maintenance. Upon receipt of the customers' payment, ComEd forwards Sperian's electric generation supply charge and Transmission Charges to Sperian, and retains its Distribution Charges and applicable taxes and fees.

8.    Sperian's generation supply charges are higher than ComEd's generation supply charges, a fact known by Sperian at the time the customer contracts are initiated, but are not disclosed by Sperian resulting in the unjust enrichment of Sperian and detriment of the customer.

9.    Sperian initiates customer contracts by the use of term-limited, "fixed" rate contracts which, upon expiration of the fixed term, are not renewed. Rather, the rates charged to Sperian customers are converted, or "rolled over" to monthly, variable rates at significantly higher generation supply charges (the per kWh rate). Because the initial fixed rate agreement automatically terminates after its specified term, Sperian's month to month generation supply charges are imposed without any agreement, and, as such, Sperian is only entitled to a *quantum meruit* payment for the supply of electricity – an amount represented for evidentiary purposes by the rate ComEd charges, the reasonable prevailing market rate for the supply of electricity.

10.   Sperian customers are initially enrolled with Sperian after being given the false impression that they were signing up for a discount on electricity from their public utility or that

-3-

they were going to save money by choosing Sperian as their electricity supplier. In fact, Sperian's customers' routinely pay much higher prices for electricity supply with Sperian than they would have paid if they had remained with or returned to the public utility for supply service. Sperian is aware of this fact at the time it solicits its customers but fails to disclose it.

11.     Sperian's conduct is deceptive, unfair, and misleading, in violation of the Illinois Consumer Fraud Act, and constitutes unjust enrichment at the expense of Plaintiffs and the other Class members.

12.     As a direct and proximate result of Defendant's conduct, as alleged herein, Plaintiffs and the other Class members were injured in that they paid Sperian's excessive per kWh electricity rates, in excess of the prevailing, reasonable market price for that electricity, depriving Illinois consumers of millions of dollars in exorbitant charges for electricity after they switch to Sperian as their energy supplier.

## PARTIES

13.     Intira Brady is a natural person and citizen of Illinois. Plaintiff Brady was a customer of Sperian Energy beginning in April 2012 through on or about August 2018.

14.     Plaintiff Brady was initially on a 12-month fixed rate plan.

15.     Once customers, like Brady, initiate their fixed rate term plan, Sperian notifies the public utility, ComEd, to bill Plaintiff Brady as a Sperian customer at Sperian's generation supply charge. ComEd then bills the customer and receives their payments. At the expiration of that term Agreement, the Agreement is not renewed but instead the plan "rolls over" to a month to month term at per kWh rates not agreed to by the parties and set solely at Sperian's discretion. However, upon information and belief, Sperian does not inform ComEd that the Agreement with its customer has expired, and ComEd continues to charge Plaintiffs, and pay to Sperian, the

higher variable month to month rate unless and until the customer "selects" a different Sperian plan, or affirmatively cancels Sperian altogether.

16.    At the expiration of her Agreement, Plaintiff Brady did not make an affirmative selection of a rate plan with Sperian. As a result, Sperian instructed ComEd to automatically charge Brady at an even higher, month-to-month "variable" rate set solely by Sperian, greatly in excess of the prevailing market price for electricity, and not agreed to by Plaintiff. Due to Defendant's deceptive conduct, and unconscionable and inequitable pricing practices, Brady incurred excessive charges for electricity.

17.    Robert Lukaszyk is a natural person and citizen of Illinois. Plaintiff Lukaszyk was a customer of Sperian Energy beginning in August 2012 through on or about November 2018.

18.    Plaintiff Lukaszyk was initially on a 12-month fixed rate plan. Sperian notified ComEd that Mr. Lukaszyk was a Sperian customer and to bill Plaintiff Lukaszyk at Sperian's fixed rate. At the expiration of the initial term, the Agreement between the Parties expired by its own terms.  However, upon information and belief, Sperian did not inform ComEd that the Agreement with Lukaszyk had expired.

19.    Rather Sperian directed ComEd to charge Lukaszyk a variable generation supply charge set by Sperian, without notice to Lukaszyk. Plaintiff Lukaszyk made no affirmative selection of a rate plan with Sperian, had no agreement with Sperian and did not consent to any increase in the generation supply charge imposed by Sperian. As a result, Plaintiff Lukaszyk was automatically charged and billed at a month-to-month "variable" set solely by Sperian, greatly in excess of the prevailing market price for electricity, and not agreed to by Plaintiff. Due to Defendant's deceptive conduct, and unconscionable and inequitable pricing practices, he incurred excessive charges for electricity.

20.     Defendant Sperian is a Nevada corporation with its principal place of business at 3010 Briarpark Drive, Suite 200, Houston, TX 77042, and is an ARES certified by the Illinois Commerce Commission ("ICC") to engage in the sale of electricity to residential retail customers in the geographic service area of the public electric utility, ComEd.

21.     At all times relevant to this Amended Complaint, Defendant was engaged in trade and commerce in the State of Illinois under the Consumer Fraud Act by marketing, selling, and promoting electricity supply to Illinois residents.  *See* 815 ILCS 505/1(t).

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative class are citizens of States different from Defendant.

23.     This Court has general personal jurisdiction over Defendant. Defendant does business in Illinois through continuous, permanent, and substantial activity in Illinois.

24.     This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of electricity to Illinois consumers.

25.     Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391. Defendant regularly transacts and solicits business in this District, and Plaintiffs reside in this District.

## SUBSTANTIVE ALLEGATIONS

26.     In 1997, Illinois deregulated the market for retail electricity supply, a major break with past policy.

27.     Prior to deregulation, electricity was supplied and distributed solely by local utility companies, Electric Distribution Companies (referred to as "EDCs"), like ComEd. The purpose of deregulation was to enhance competition between energy providers in the hopes that ARESs such as Sperian would help to lower energy costs and result in savings to consumers.

28.     In January 2012, Sperian received a Certificate of Service Authority to operate as an ARES from the ICC. Under the certificate, Sperian was permitted to sell electricity to eligible residential and nonresidential retail customers in the geographic service area of the public electric utility, ComEd.

29.     Since at least April 2012, Sperian has engaged in the marketing and sale of electricity to Illinois residential customers in ComEd's service territory.

30.     According to the Illinois Commerce Commission, from June 1, 2016 – May 31, 2017, ARES customers in the ComEd territory paid $198 million more in generation supply charges for the identical electricity supplied by ComEd.

31.     In the past three years, residential and small-commercial ARES customers statewide have paid almost $400 million more for electricity than they would have been charged had they remained ComEd customers.[1]

32.     Illinoisans are not alone in having suffered severe financial harm. Of the 42 states that started the deregulation process or considered it, only 17 and the District of Columbia remain deregulated or partially deregulated.

33.     A Connecticut leader who participated in that state's foray into energy deregulation summarized the negative consequences of deregulation, "Probably six out of the

187 legislators understood it at the time, because it is so incredibly complex . . . . If somebody says, no, we didn't screw up, then I don't know what world we are living in. We did."[2]

34.     The deceptive practices of ARESs like Sperian have been devastating to consumers nationwide, including in Illinois, and this lawsuit is further proof that residential energy deregulation has been an abject failure.

35.     Each public electric utility in Illinois has a defined service territory and serves all residential customers in that territory. ComEd is a member of the PJM Interconnection ("Grid") where wholesale prices are established according to local market conditions known as the Electric Utility load zone.

36.     The prices that public electric utilities charge eligible residential customers for electricity supply ("utility default price") are regulated by the ICC. Under Illinois law, public electric utilities purchase electricity at prices established by the PJM Interconnect for the specific Electric Utility Load Zone. ComEd charges generation supply rates set by the ICC so as to allow for a return on the cost of providing electricity. Because ComEd is the dominant provider of electricity within in its designated territory, its price per kWh is the prevailing market price.

37.     Under the Illinois Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILCS 5/16-101 *et. seq.*, Illinois' electricity deregulation statute, consumers may choose to purchase their electricity supply from an ARES rather than their public electric utility. If a consumer decides to switch to an ARES, the consumer continues to pay the public electric utility (EDC) for delivery service, and is billed by the EDC based upon the utilities usage meter

---

[1]     Illinois Attorney General Lisa Madigan is pursuing legislation to require stronger oversight of ARESs. *See* http://www.illinoisattorneygeneral.gov/pressroom/2018_04/20180409.html.

readings, but pays the ARES at the per kWh generation supply charges set by the ARES who can acquire electricity at wholesale rates from various sources. Prices per kWh for electricity are referred to as "generation supply charges". Regardless of whether the consumer selects an ARES or the utility as their supplier, the utility continues to deliver electricity to the consumer's home, and maintains all distribution facilities.

38.     As such, ARESs, like Sperian, play a middleman role: they purchase energy directly or indirectly from companies that produce energy and sell that energy to end-user consumers. However, ARESs do not deliver energy to consumers. Rather, the companies that produce energy deliver it to consumers' utilities (EDCs), which in turn deliver it to the consumer. ARESs merely buy electricity at the wholesale rate and then sell that energy to end-users with a mark-up. Thus, ARESs are essentially brokers and traders: they neither make nor deliver electricity, but merely buy electricity from a producer and resell it to consumers.

39.     After a customer switches to an ARES, the customer's electric generation rate (a/k/a "generation supply charge") is based on the product of the customer's kilowatt hour usage, times the electric generation supply rate set by the ARES and not the regulated rate charged by customer's former utility. The electric generation supply rate is itemized on the customer's bill as the number of kilowatt hours ("kWh") multiplied by the rate. For example, if a customer uses 300 kWh at a rate of 11.0¢ per kWh, the customer will be billed $33.00 (300 x $.11) for her energy supply.

40.     As part of Illinois' deregulation plan, ARESs such as Sperian are subject to minimal regulation and do not have to seek approval of their electric generation supply rates, nor

---

[2]     Christopher Keating, Eight Years Later . . . "Deregulation Failed" HARTFORD COURANT,     Jan. 21, 2007, n. 5.

the method by which they set their rates, with the Illinois Commerce Commission ("ICC"). *See* Illinois Administrative Code, Title 83: Public Utilities, Chapter I: Illinois Commerce Commission, Subchapter c: Electric Utilities Part 412 *et seq.*

41.     Sperian takes advantage of the deregulation and the lack of regulatory oversight in the energy market by deceptively baiting consumers with false promises and misleading representations regarding savings and discounts on their electric utility bills, when in reality Sperian charges Illinois consumers exorbitant rates for electricity supply, far greater than the rates they would have been charged had they not switched over from their public utility to Sperian. When making their misleading presentations to consumer, Sperian knows their electric generation supply charges are significantly higher than the generation supply charges of the local EDC but fails to disclose this fact to their customers either at the time of initial contract nor at any time thereafter.

42.     The end result is that, instead of benefitting from switching to Sperian, a typical customer loses out – to the tune of hundreds or even thousands of dollars per year. Thus, Sperian deceptively causes its customers to pay considerably more for electricity supply than they should have and otherwise would have paid.

43.     Sperian charges its customers based on the how much electricity (measured in kilowatt hours, kWh) they are supplied each month. Sperian sells several different types of plans with different rates (price per kilowatt hour) and contract lengths.

44.     Primarily Sperian plans are of two types (sometimes referred to as "products"): fixed term rate and variable (month to month) products.

45.     Under Sperian's fixed rate plans, consumers pay a fixed rate for a set period of time, often 3-months, 6-months, or 12-months.

46.     Upon information and belief, the historic rates charged by Sperian to Illinois customers on a fixed term rate are higher than the public utility default rate 52% of the time from April 2012 and April 2017.

47.     Upon information and belief, the rates charged by Sperian to Illinois customers while they were on a month-to-month variable rate billing are significantly higher than the public utility default rate 80% of the time from April 2012 through April 2017.

48.     In addition to the monthly per kilowatt hour charges, Sperian also charged customers a $4.93 monthly "Energy Service Fee" or "Utility Billing Fee". Sperian customers do not receive any additional services, beyond supply of electricity, as a result of paying the Energy Service Fee.

49.     Sperian's dominant form of marketing in Illinois is telephone solicitation. Sperian also engages in door-to-door marketing and direct mail marketing.

**<u>Sperian's Contractual Relationship with Customers</u>**

50.     Sperian posts "Terms and Conditions" ("T&C") which purport to constitute the Agreement between Sperian and its customers. A true and correct copy of an exemplar Terms and Conditions are attached as **<u>Exhibit B</u>** hereto.

51.     The T&C purports to be the "Agreement" for the purchase of electricity services by the Customer from Sperian. It provided, in part, as follows:

     A.     Depending upon the plan you (Customer) have selected, your service under this Agreement is provided under either a term product or a variable product (month to month) product;

     B.     This agreement does not renew automatically. At the end of the initial term, if you do not choose a new plan, your plan will roll over into a month to month variable rate. A contract expiration notice will be sent to you at least 30 days but no more than 60 days prior to the end of your initial contract term explaining your renewal options;

C. Your tem contract rate will be disclosed to you at the time of enrollment;

D. If you selected a variable plan, rates will be subject to change at the discretion of Sperian;

E. In the event of a billing dispute or a disagreement involving any element of this Agreement, the parties will use their best efforts to resolve the dispute;

F. This Agreement shall be governed by and construed, enforced and performed in accordance with the laws of Illinois and venue shall be in Sangamon County Illinois.

52. According to the T&C, upon expiration of the initial term agreement, it does not renew unless the customer affirmatively selects a new plan.

53. The Plaintiffs fixed term agreements, and those of the proposed class, all expired without renewal and without selecting a new plan, as such the Terms and Conditions expired under its own provisions upon the date of term expiration.

54. According to the T&C, once the initial term expired the parties have no agreement other than to be charged a "month to month variable rate". This variable rate is not disclosed, is not defined, is not a variable plan "selected" by the customer, and does not permit Sperian to set the month to month rate "at the discretion of Sperian", a provision only applicable "[i]f you have selected a variable plan".

55. Because the T&C expressly provides that the Contract "does not renew automatically", it does not renew. Rather the Agreement automatically expires of its own terms, but for the provision to pay month to month for the electricity actually used, although without any rate agreed upon. The post-Agreement use of electricity supplied by Sperian can, under controlling Illinois law, only be charged at the reasonable market rate for the commodity provided, which under these circumstances is the ComEd electricity generation supply rate.

Continued use of electricity is not assent to renewal of the Agreement, which itself states it is not renewed, and no other agreement having been selected by the customer. To the contrary, for a "variable rate plan" to be applicable, it must be "selected" by the customer following expiration of the Initial Agreement.

56.     Sperian, rather than inform the EDC that its Agreement with the customer has expired, and that no variable plan has been selected by the customer, implicitly directs the EDC, ComEd, to continue billing the customer at rates not agreed to by the customer, and at rates significantly higher than the reasonable, prevailing market price for that electricity supply.

57.     The Governing Law provisions of the Agreement are, by the express terms of the T&C, only applicable to "[t]his Agreement" and are not applicable once the initial term has expired and no other agreement having be agree to by the parties.

58.     Upon information and belief, all customers of Sperian, including both Plaintiffs, receive a "Welcome to Sperian Energy" letter (the "Welcome Letter") and accompanying "Sperian Energy Corp Illinois Electric Service Area Customer Terms and Conditions" (the "T&C").

59.     The Welcome Letter generally describes what a customer will experience when having his/her electricity supplied by an ARES like Sperian. It also provides contact information for Sperian and discloses the fixed rate per kWh and term for the fixed rate plan.  It makes no disclosure of what Sperian's month to moth rates have been or will be.

60.     The Welcome Letter represents that the electricity supplied by Sperian is provided "at a great low rate" or as a "discounted electric generation rate."  Exhibit A at 1.

61.   The Welcome Letter also states that "generation and transmission charges" are included in "Your rate" but "does not include a Utility Billing Fee of $4.93/mo., or any other state and local taxes."  Exhibit A at 1.

62.   The T&C states:

The following is your Terms of Service and, coupled with your authorization, either through online enrollment, or a recorded call verification process, reflects the agreement ("Agreement") between Customer and Sperian Energy Corp ("Sperian") for the purchase of electricity service.

Exhibit B at 1.  Thus, the Agreement consists of two items: (1) the Terms of Service as set forth in the document itself (i.e. the "Sperian Energy Corp Illinois Electric Service Area Customer Terms and Conditions"), and (2) the customer's affirmative authorization in the form of an online enrollment or recorded call (collectively, the "Initial Agreement").

63.   The T&C, under the heading "Service Term", states:

Depending on which plan you (Customer) have selected, your service under this Agreement is provided under either a term product or a variable (month-to month) product.  … If you are a new Customer, your selected product will become effective on the day your service begins with Sperian … .

Exhibit B at 1.  Thus, Sperian differentiates between the Agreement, the plan, and the product. The products offered are "term" or "variable".  Each product has a "plan(s)". The electricity supply service offered by Sperian to a new customer under a product and plan selected by the customer is governed by this Agreement.

64.   Both Plaintiffs were new customers of Sperian and each selected a fixed term product that offered a fixed rate plan for 12 months at a stated rate disclosed on the Welcome Letter.

65.   Under the heading "Contract Renewal", the T&C states:

> This agreement does not renew automatically. At the end of the initial term, if
> you do not choose a new plan, your plan will rollover into a month-to-month
> variable rate.

Exhibit B at 1. Thus, by its own terms, the Agreement expires after the duration of the term. In this case, the Agreement that both Plaintiffs entered into expired 12 months after each customer's initial enrollment.

66.     At the end of the 12-month fixed rate term, neither Plaintiff affirmatively selected a new plan, a variable plan, or any plan at all. Rather each Plaintiff was "rolled over" into a month-to-month variable rate.

67.     During the period in which each Plaintiff was on a month-to-month variable rate, there was no written agreement governing the Parties' relationship. There were no applicable "Terms of Service" or "Terms and Conditions" because the provisions of the initial T&C "d[id] not renew automatically." As a result, there was no agreement as to the price to be charged or the method in which such price would be calculated for each and every month each Plaintiff was in the "month-to-month variable rate".

68.     In addition, because there was no agreement during the period of time each Plaintiff was on a month-to-month variable rate plan, none of the provisions contained within the initial T&C are enforceable vis-à-vis either Plaintiff, including the provision relating to the "Governing Law" and the statement within that "venue shall be in Sangamon County". Exhibit B at 2.

69.     The initial T&C states that a "contract-expiration notice will be sent" to the customers "prior to the end of [the] initial contract term explaining your renewal options." Exhibit B at 1 "Contract Renewal". Neither Plaintiff received such a notice.

70.     Even if revised Terms and Conditions were sent to each Plaintiff or a contract-expiration notice indicating that the initial T&Cs would apply to the Parties' future relationship, such mailing by itself would be insufficient to create an agreement. This is so because Sperian required that the Initial Agreement include not only an applicable set of Terms and Conditions but the customer's affirmative "authorization" through either an "online enrollment" or a "recorded call verification process". Thus, a customer would expect, and past practice between the Parties would require, that in order for there to be any agreement related to the month-to-month variable rate plan, the customer would have to provide such clear "authorization".

71.     Likewise, as the party seeking to enforce a contract, the burden is on Defendant to prove that each Plaintiff received document(s) that could constitute an "Agreement" vis-à-vis the provision of electricity service for the "month-to-month variable rate plan".

72.     Under the heading "Pricing & Payment", the T&C states:

> Each payment period, you will receive a single bill from your EDC that includes Sperian generation supply charges as well as the EDC's delivery charges. Your term contract rate will be disclosed to you at the time of enrollment. If you selected a variable plan, rates are subject to change monthly at the discretion of Sperian. The price will include Electricity Supply Charges and Transmission Charges, but does not include any fixed charges specified in your plan, Distribution Charges from your local EDC, applicable Illinois sales tax, or any local tax.

Exhibit B at 1. As stated above, neither Plaintiff "selected a variable plan". Instead, each Plaintiff was automatically "rolled over" into a month-to-month variable rate because neither Plaintiff "cho[]se a new plan". *See* "Contract Renewal".

73.     Thus, Sperian did not have any authorization to charge a variable rate that "change[s] monthly at the discretion of Sperian."[3] *See* "Pricing & Payment".

74.     Nor is the $4.93 per month "Utility Billing Fee" a "fixed charge" specified in the rollover month-to-month variable rate plan.[4] *Id.*

75.     Likewise, there is no Agreement that authorizes Sperian to charge customers "rolled over" into a month-to-month variable rate plan the $4.93 per month "Utility Billing Fee" because the Initial Agreement expired by its own terms.

### Plaintiffs' Experience with Sperian

#### *Plaintiff Brady's Experience*

76.     Plaintiff Brady's experience was typical.  In or around April 2012, a Sperian representative solicited Ms. Brady to switch from her utility company, ComEd, to Sperian with promises of a more competitive rate if she switched to Sperian.

77.     In or around April 2012, Plaintiff made the switch to Sperian for electricity.

78.     Plaintiff was initially placed on an introductory fixed rate plan for electricity for 12 months.

---

[3]     In the alternative, if there was a contract providing for changing monthly rates at Sperian's "discretion", the discretion would be limited both by the UCC and common law requiring that where there is a silent or missing price term, that the price term must be reasonable and by the implied covenant of good faith and fair dealing which requires a party vested with contractual discretion to exercise such discretion reasonably and consistent with the subjective intent of the parties.

[4]     The Utility Billing Fee is only disclosed in the Welcome Letter and seems to only apply to the fixed rate term plan described. However the Welcome letter expressly states, in the negative, "[y]our rate includes generation and transmissions charges. It *does not* include a Utility Billing Fee or $4.93/mo., or any other state or local taxes." In the alternative, if Sperian argues that the Welcome Letter forms part of the Parties' contract such that the $4.93 per month Utility Billing Fee is properly billed, then the remaining portions of the Welcome Letter would also apply, including the representations that the rate to be charged by Sperian is a "great low rate" and a "discounted electric generation rate".

79.    After the fixed rate plan and the Agreement expired, Plaintiff was "rolled over" to a variable rate without an agreement.

80.    The following chart identifies a representative sampling of billing periods during the time Plaintiff was on Sperian's electricity plan. It lists the prices that Plaintiff paid Sperian during her variable-rate period and compares these prices to ComEd's prices (i.e. the price Ms. Brady would have paid if she didn't switch) during this same time. The chart clearly demonstrates that Sperian's rate was significantly higher than ComEd's rate:

| Billing Period[5]<br>Service End<br>Date[6] | Sperian Rate<br>($/kWh) | ComEd Rate<br>($/kWh)[7] | % Difference |
|---|---|---|---|
| 8/26/2016 | 0.0759 | 0.06261 | 21% |
| 9/27/2016 | 0.0739 | 0.0628 | 18% |
| 10/27/2016 | 0.0739 | 0.05888 | 26% |
| 11/28/2016 | 0.0769 | 0.05888 | 31% |
| 12/30/2016 | 0.0769 | 0.05888 | 31% |
| 1/31/2017 | 0.0859 | 0.05818 | 48% |
| 3/2/2017 | 0.0859 | 0.05818 | 48% |
| 3/29/2017 | 0.0859 | 0.06185 | 39% |
| 4/27/2017 | 0.0859 | 0.05818 | 48% |
| 5/30/2017 | 0.0764 | 0.06161 | 24% |
| 6/29/2017 | 0.0899 | 0.07044 | 28% |

---

[5]    The billing periods listed in the chart have been identified through the bills that are in Plaintiff's possession.  The full billing summary of the time Plaintiff enrolled in Sperian's plan and the rates Plaintiff was charged will be ascertained through discovery.

[6]    The first day of the period is approximately thirty days before.

[7]    The ComEd Rate is the rate a customer would have paid if he/she stayed with or switched back to ComEd as the supplier of electricity (except those on ComEd's Residential Real Time Pricing Program).  A description of how this ComEd rate is calculated can be found at: https://www.pluginillinois.org/FixedRateBreakdownComEd.aspx. (last accessed January 8, 2019).  In general, the rate is calculated by taking the Historical Prices to Compare and adding the Purchased Electricity Adjustment ("PEA").  This calculation is consistent with the fact that "[w]hen you select service from a retail electric supplier, the ComEd Electric Supply Charges (including the Purchased Electricity Adjustment) and Transmission Services Charges (items A and B below) will be replaced with the charges from your new retail electric supplier."

| Billing Period[5] Service End Date[6] | Sperian Rate ($/kWh) | ComEd Rate ($/kWh)[7] | % Difference |
|---|---|---|---|
| 7/26/2017 | 0.0899 | 0.06969 | 29% |
| 8/24/2017 | 0.0899 | 0.07082 | 27% |
| 9/22/2017 | 0.0829 | 0.07103 | 17% |
| 10/23/2017 | 0.0999 | 0.06649 | 50% |
| 2/26/2018 | 0.1179 | 0.07485 | 58% |
| 3/27/2018 | 0.1179 | 0.06898 | 71% |
| 4/25/2018 | 0.12399 | 0.06695 | 85% |
| 5/24/2018 | 0.12606 | 0.06818 | 85% |
| 6/25/2018 | 0.12699 | 0.07334 | 73% |

81.     That Sperian's rate was consistently and substantially higher than ComEd's rate therefore demonstrates that Sperian's rate was not a discounted rate which resulted in savings to Plaintiff.

82.     That Sperian's rate was consistently and substantially higher than ComEd's rate demonstrates that Sperian's rate was not representative of the *quantum meruit* value of the electricity supplied.

83.     As evidenced by the above chart, there were multiple months where Plaintiff's electricity rate with Sperian was ***over 60% higher*** than ComEd's rate during that same billing period.

### *Plaintiff's Lukaszyk's Experience*

84.     Plaintiff Lukaszyk's experience was typical of Sperian's deceptive sales practices as set forth above.

85.     In or around August 2012, a Sperian representative, Samantha, solicited Mr. Lukaszyk via telephone to switch from his utility company, ComEd, to Sperian with promises that his rate would always be lower than ComEd if he switched.

86.     The Sperian sales representative represented to Plaintiff Lukaszyk that if he switched to Sperian, "the rate will 100% be lower now, 1 year from now, 5 years from now, and always" as compared to ComEd's rate.

87.     Relying on the representations made by Sperian, Plaintiff, on the morning of August 14, 2012, made the switch to Sperian's electricity plan.

88.     Plaintiff was initially placed on a fixed rate plan for electricity for 12 months. After the fixed rate plan and the Agreement expired, Plaintiff was "rolled over" to a variable rate without an agreement. Upon information and belief, Sperian never told Plaintiff on the telephone call prior to signing up that his rate would roll over to a variable rate and that the variable rate would always be higher than ComEd's rate.

89.     The following chart identifies a representative sampling of billing periods during the time Plaintiff Lukaszyk was on Sperian's electricity plan. It lists the prices that Plaintiff Lukaszyk paid Sperian and compares these prices to ComEd's prices during this same time. The chart clearly demonstrates that Sperian's rate were significantly higher than ComEd's rate:

| Billing Period End Date | Sperian Rate ($/kWh) | ComEd Rate ($/kWh) | % Difference |
|---|---|---|---|
| 12/6/2016 | 0.0769 | 0.05888 | 31% |
| 1/9/2017 | 0.0879 | 0.05888 | 49% |
| 2/8/2017 | 0.0859 | 0.05818 | 48% |
| 3/8/2017 | 0.0859 | 0.05818 | 48% |
| 4/6/2017 | 0.0859 | 0.06185 | 39% |
| 5/5/2017 | 0.0799 | 0.05818 | 37% |
| 6/6/2017 | 0.0899 | 0.06161 | 46% |
| 7/6/2017 | 0.0899 | 0.07044 | 28% |
| 8/4/2017 | 0.0899 | 0.06969 | 29% |
| 9/2/2017 | 0.0829 | 0.07082 | 17% |
| 10/3/2017 | 0.0829 | 0.07103 | 17% |
| 11/1/2017 | 0.1099 | 0.06649 | 65% |
| 12/4/2017 | 0.1099 | 0.06649 | 65% |

| Billing Period End Date | Sperian Rate ($/kWh) | ComEd Rate ($/kWh) | % Difference |
|---|---|---|---|
| 1/5/2018 | 0.1099 | 0.06649 | 65% |
| 2/6/2018 | 0.1149 | 0.06786 | 69% |
| 3/7/2018 | 0.1179 | 0.07485 | 58% |
| 4/5/2018 | 0.1179 | 0.06898 | 71% |
| 5/4/2018 | 0.12399 | 0.06695 | 85% |
| 6/5/2018 | 0.12699 | 0.06818 | 86% |
| 7/5/2018 | 0.12699 | 0.07334 | 73% |
| 8/3/2018 | 0.13187 | 0.07051 | 87% |
| 9/4/2018 | 0.1483 | 0.0727 | 104% |
| 10/3/2018 | 0.1483 | 0.06993 | 112% |
| 11/1/2018 | 0.1483 | 0.06792 | 118% |

90. That Sperian's rate was consistently and substantially higher than ComEd's rate therefore demonstrates that Sperian's rate was not a discounted rate which resulted in savings to Plaintiff.

91. That Sperian's rate was consistently and substantially higher than ComEd's rate demonstrates that Sperian's rate was not representative of the *quantum meruit* value of the electricity supplied.

92. As evidenced by the above chart, there were multiple months where Plaintiff's electricity rate with Sperian was over ***100% higher*** than ComEd's rate during that same billing period.

93. Sperian's statements with respect to the electricity rates it charges are materially misleading because consumers do not receive a discounted rate compared to ComEd nor do they save money by switching to Sperian's plan. Instead, consumers are charged rates that are always substantially higher than the local utilities' rates. Sperian failed to disclose this material fact to its customers.

94.     As set forth above, Sperian's statements and omissions regarding its electricity rates are materially misleading, and likely to mislead a reasonable consumer when choosing an energy supplier is price. No reasonable consumer who knows the truth about Sperian's exorbitant rates would choose Sperian as an electricity supplier.

95.     Sperian's customers are charged rates that are substantially higher than those of ComEd. Sperian intentionally fails to disclose this material fact to its customers because no reasonable consumer—including Ms. Brady and Mr. Lukaszyk—who knows the truth about Sperian's exorbitant rates would choose Sperian as an electricity supplier.

96.     Sperian intentionally makes these misleading statements and omissions regarding its electricity rates so that reasonable consumers like Plaintiff would be mislead and rely upon its statements and omissions to switch their electricity supplier to Sperian.

97.     In fact, all that Sperian offers customers is electricity delivered by local utilities, like ComEd – commodities that have the ***exact same*** qualities as electricity supplied by other local utilities. Indeed, there is nothing to differentiate Sperian Energy from ComEd, and the potential for a discounted rate and savings is the only reason any reasonable consumer would choose Sperian as her electricity supplier.

98.     Sperian knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes with regard to its plans and pricing were made for the sole purpose of inducing consumers to sign up for Sperian's electricity supply so that it can reap outrageous profits to the direct detriment of Illinois consumers without regard to the consequences high utility bills cause such consumers.

99.     Sperian's misstatements and omissions caused injury to Plaintiffs because they believed that their rate would be a lower, discounted rate when switching from ComEd to

Sperian's electricity plan. Plaintiffs would not have enrolled in Sperian's plan but for its false and misleading misrepresentations. Had Plaintiffs known that the rates they would be charged by Sperian would be substantially higher than their local utility provider, they would not have made the decision to switch. They were injured accordingly when they paid their bills.

100. Defendant's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.* and the common law are applicable to all members of the Class, and Plaintiffs are entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## CLASS ALLEGATIONS

101. Plaintiffs bring this action pursuant to Illinois law on behalf of themselves and all other similarly situated persons in the State of Illinois who were enrolled in an initial term contract which expired without selection by the customer of a variable rate plan, at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment.

102. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or complaint.

103. Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which any Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

104. This action is properly maintainable as a class action. The proposed Class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable.

There are questions of law or fact common to all Class Members that predominate over any questions affecting only individual members. Specifically, the common questions of fact and law include:

    A.    whether Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

    B.    whether Defendant is being unjustly enriched by deceptively charging rates substantially higher than the local utilities rates, including ComEd;

    C.    whether Defendant is being unjustly enriched by charging rates substantially higher than what it is entitled to under *quantum meruit*;

    D.    whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof; and

    E.    whether Defendant should be enjoined from continuing to charge unconscionable electricity rates.

105.    The proposed lead Plaintiffs' claims are typical of those of the proposed class because the proposed lead Plaintiffs' claims are based upon the same facts and circumstances (practice or course of conduct) that gives rise to the claims of the other class members and based upon the same predominate legal theories.

106.    The representative Plaintiffs can adequately and fairly represent the class. No conflict of interest exists between the representative Plaintiffs and the Class Members because Defendant's alleged conduct affected them similarly.

107.    The Plaintiffs and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this First Amended Complaint so as to be able to assist in its prosecution. In addition, the Plaintiffs' attorneys are competent in the areas of law relevant to this First Amended Complaint and have sufficient experience and resources to vigorously represent the Class Members and prosecute this action.

108.    A class action is superior to any other available method for adjudicating this controversy. The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the Class, (ii) to keep the courts from being inundated by hundreds or thousands of repetitive cases, and (iii) to reduce transactions costs so that the injured class members can obtain the most compensation possible. Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation relevant to this action.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

109.    Any applicable statute of limitations that might otherwise apply to bar any of Plaintiffs' and/or the other Class members' claims should be tolled by Defendant's knowing and active concealment of the fact that Class members are being grossly overcharged for their electricity. Defendant withheld from Plaintiffs and the other Class members vital information essential to the pursuit of their claims. Plaintiffs and the other Class members could not have discovered, even upon reasonable exercise of diligence, that their purchases were unrelated to actual market costs and grossly inequitable.

110.    As Plaintiffs' electricity supplier, Sperian occupies a position of influence and superiority over Plaintiffs and the other Class members. Thus, Sperian was under a continuous duty to disclose to Plaintiffs and the other members of the Class the true character, quality, and nature of its electricity plans. By marketing and supplying its electricity to its above-described deceptive, unfair, and inequitable business practices, Sperian knowingly, affirmatively, and actively concealed the true character, quality, and nature of its electricity plans. Based on the foregoing, Sperian is estopped from relying on any statutes of limitation in defense of this action.

## CLAIMS FOR RELIEF

**COUNT I**
**(Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS**
**§ 505/1 *et seq.*)**

111.    Plaintiffs incorporate each of the allegations in Paragraphs 1-110, above, as if fully set forth herein.

112.    815 ILCS § 505/2 declares unlawful "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce[.]"

113.    While engaged in trade or commerce, Defendant has committed unfair and deceptive acts or practices declared unlawful under Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by, in the course of marketing, selling, and promoting electricity supply to Illinois residents, making the following misrepresentations or omissions, with the intent that consumers rely on these misrepresentations and omissions:

   A.    Misrepresenting, expressly or by implication, that consumers would save money with Sperian when Sperian's supply charges were routinely higher than the default public utility rate for electricity supply;

   B.    Misrepresenting, expressly or by implication, that Sperian is affiliated with the consumer's public electric utility;

   C.    Misrepresenting, expressly or by implication, that consumers were entitled to savings on their electric bill under state or federal law;

   D.    Misrepresenting, expressly or by implication, that consumers were entitled to savings through an energy choice program;

E.      Misrepresenting, expressly or by implication, that Sperian would apply a discount to the consumer's existing electricity service with ComEd, when in fact consumers were routinely enrolled in a new, more expensive, supply service;

F.      Failing to disclose the material fact that consumers would be charged a monthly "Energy Service Fee" in addition to the monthly electricity use charges;

G.      Failing to disclose the material fact that Sperian's generation supply rates are higher than generation supply rates currently being charged the customer by its EDC, have historically always been higher and will likely always be higher;

H.      Automatically enrolling the customer after expiration of the initial fixed term into a variable rate plan which the customer did not choose, and at a rate(s) the customer never agreed to;

I.      Failing to terminate the fixed term agreement upon the expiration of the initial term;

J.      Failing to inform the EDC that the customers' fixed term agreement had expired at the expiration of the fixed term and instructing the EDC to charge a month to month generation supply charge that the customer had not agreed to; and

K.      Failing to disclose the material fact of the rates that consumers would be charged.

114.    While engaged in trade or commerce, Defendant has committed unfair acts or practices declared unlawful under Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by, in the course of marketing, selling, and promoting electricity supply to Illinois residents, representing that consumers can save money through an introductory rate, and then moving the consumer to a variable rate that:

A.      Was not clearly and conspicuously disclosed at the time of enrollment or in the contract renewal materials sent at the time their introductory rate was ending; and,

B.      In fact was higher or significantly higher than the rate the consumer was previously paying under the introductory rate.

115.    Sperian knowingly and willfully failed to inform consumers of the material fact that its rates are substantially higher than the local utilities rates, including ComEd, and intends that consumers rely upon the deception.

116.    Sperian's deception caused Plaintiffs and the class to pay substantially higher rates than those provided by the local utilities, including ComEd.

117.    Sperian made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

118.    Plaintiffs and the other members of the Class enrolled in Sperian's plans for personal use and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of Illinois Consumer Fraud and Deceptive Business Practices Act.

119.    As a consequence of Defendant's wrongful actions, Plaintiffs and the other members of the Class suffered an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had they not switched to Sperian from their previous supplier.

120.    Plaintiffs and other members of the Class suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Sperian if the true facts concerning its rates had been known.

121.    Through the conduct described above, Sperian has engaged in deceptive acts and practices that resulted in injury to Plaintiffs and the other members of the Class.

122.    By reason of the foregoing, Sperian has violated ICFA and should be enjoined from continuing to fail to disclose that its rates are substantially higher than those provided by the local utilities, including ComEd.

123.    Sperian is also liable to Plaintiffs and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees and costs.

124. Sperian's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiffs and the other members of the Class. Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## COUNT II
### (Common Law Fraud)

125. Plaintiffs incorporate each of the allegations in Paragraphs 1-110, above, as if fully set forth herein.

126. Defendant failed to disclose all material facts and/or misrepresented material facts about its electricity rates, to Plaintiffs and the other Class members, as set forth above.

127. Defendant's non-disclosures and/or misrepresentations with respect to its electricity rates are part of a systematic and uniform practice, including telemarketing scripts used by Defendant's sales representatives to solicit ComEd customers—including Plaintiffs and the other Class members — to enroll in its electricity plans.

128. Defendant's misrepresentations and material omissions about its electricity rates prohibited Plaintiffs and the other Class members from making an informed choice as to whether to enroll in Sperian's energy plans.

129. Plaintiffs and the other Class member relied to their detriment upon Defendant's material omissions and/or misrepresentations of material fact about Sperian's energy rates and their reliance on Defendant to properly disclose the nature of such charges was justified.

130. As a result of Defendant's actions, Plaintiffs and the other Class members were damaged for each month they paid Defendant's rates.

131.   Defendant's deceptive, misleading, unfair, or unconscionable practices set forth above were and are done willfully, wantonly, and maliciously, entitling Plaintiffs and the other Class members to be awarded actual damages, punitive damages, and equitable relief.

132.   Wherefore, Plaintiffs seek, on behalf of themselves and the other Class members, injunctive relief, actual damages, restitution, exemplary or punitive damages, prejudgment and post-judgment interest, attorneys' fees, expenses, the costs of this action, and all other and further relief as the Court deems necessary, just, and proper,

## COUNT III
**(Unjust Enrichment)**

133.   Plaintiffs incorporate each of the allegations in Paragraphs 1-110, above, as if fully set forth herein.

134.   By engaging in the conduct described above, Sperian has unjustly enriched itself and received a benefit beyond what was contemplated based on Sperian deceptively charging electricity rates substantially higher than the local utilities rates, including ComEd, at the expense of Plaintiff and the other members of the Class.

135.   By engaging in the conduct described above, Sperian has unjustly enriched itself and received a benefit beyond what it is entitled to under *quantum meruit* by charging electricity rates substantially higher than the local utilities rates, including ComEd, at the expense of Plaintiff and the other members of the Class.

136.   The ComEd electric generation supply charge is the prevailing, reasonable rate for electricity and is representative of the *quantum meruit* amount that Defendant is entitled absent a contract.

137.    Defendant has knowingly appreciated and accepted this benefit, which has resulted and continues to result in an inequity to Plaintiffs and the other Class members. Defendant's appreciation and acceptance of this benefit is inequitable.

138.    It is inequitable for Defendant to retain the monies for electricity supply they have received, and continue to receive, from Class members. As a result of its tortious, fraudulent, deceptive, unfair and inequitable conduct, Defendant's retention of such funds constitutes unjust enrichment under Illinois law.

139.    Defendant was, and continues to be, unjustly enriched at the expense of its customers, causing damage to Plaintiffs and the other Class members, and a constructive trust of the monies wrongly taken should be imposed upon Defendant for the benefit it received to the detriment of Plaintiffs and the other Class members.

140.    Allowing Defendant to retain the benefit gained from deceiving Plaintiffs and the other Class members in the manner(s) described above violates the fundamental principles of justice, equity, and good conscience.

141.    Plaintiffs, individually and on behalf of the other Class members, seek an award of appropriate damages, including full disgorgement and restitution of Defendant's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein, costs, and any other relief the Court deems appropriate.

142.    Wherefore, Plaintiffs seek, on behalf of themselves and the other Class members, injunctive relief, actual damages, restitution, statutory damages, exemplary or punitive damages, prejudgment and post-judgment interest, attorneys' fees, expenses, the costs of this action, and all other and further relief as the Court deems necessary, just, and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the other members of the Class, respectfully request that the Court order relief and enter judgment against Defendant as follows:

(a) An order certifying the proposed Class and appointing Plaintiffs Brady and Lukaszyk as Class Representatives and their counsel as Class Counsel;

(b) An order that Defendant be permanently enjoined from their improper and unlawful conduct and practices alleged herein;

(c) A judgment awarding Plaintiffs and the other Class members their actual damages in an amount according to proof for Defendant's unlawful conduct alleged under all claims herein, entitling Plaintiffs and the other Class members to their actual damages;

(d) A judgment awarding Plaintiffs and the other Class members restitution, including, without limitation, disgorgement of all profits and unjust enrichment obtained by Defendant as a result of its wrongful conduct, as alleged herein;

(e) A judgment awarding Plaintiffs and the other Class members statutory damages as a result of Defendant's wrongful conduct, as alleged herein;

(f) A judgment awarding Plaintiffs and the other Class members exemplary or punitive damages for Defendant's knowing, willful, and intentional conduct, as alleged herein;

(g) Prejudgment and post-judgment interest;

(h) Attorneys' fees, expenses, and the costs of this action; and

(i) All other and further relief as the Court deems necessary, just, and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.


Date: January 8, 2019                                    Respectfully submitted,


                                                         INTIRA BRADY and ROBERT LUKASZYK
                                                         Class Plaintiffs,

_/s/ Richard J. Burke_ 
Richard J. Burke
Jamie E. Weiss
Zachary A. Jacobs
**QUANTUM LEGAL LLC**
513 Central Avenue
Suite 300
Highland Park, IL 60035
Tel: (847) 433-4500
rich@qulegal.com
jamie@qulegal.com
zachary@qulegal.com

Jonathan Shub
Kevin Laukaitis
**KOHN SWIFT & GRAF, P.C.**
1600 Market Street
Suite 2500
Philadelphia, Pennsylvania 19103
(215) 238-1700
jshub@kohnswift.com
klaukaitis@kohnswift.com

Charles E. Schaffer
Daniel C. Levin
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: 215-592-1500
CSchaffer@lfsblaw.com
DLevin@lfsblaw.com

**Attorneys for Plaintiffs and
the Class**